```
            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 5:13CV1298 |
| EX REL. PATRICIA DOWNES, | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH P. THOMAS, M.D., | ) | COMPLAINT IN INTERVENTION |
| | ) | |
| Defendant. | ) | |

                        PRELIMINARY STATEMENT

1.    Defendant, Joseph P. Thomas, M.D., has knowingly submitted false or fraudulent claims to Medicare for which Defendant sought reimbursement for medical and laboratory tests which were not reasonable and medically necessary.  Defendant also falsified laboratory test results and caused those tests to be billed to Medicare.  Such conduct violates the False Claims Act, 31 U.S.C. § 3729.  As a result of this fraud, the United States has paid Medicare Part B monies to Defendant which the Defendant is not entitled.  Defendant was further unjustly enriched by these payments and was paid by mistake.

     2.   This Complaint is part of a qui tam action brought by Relator, Patricia Downes ("Relator") on behalf of the United States.  On June 12, 2013, Relator filed a Complaint for violations of 31 U.S.C. § 3729 on behalf of herself and the United States pursuant to 31 U.S.C. § 3730(b)(1).

## JURISDICTION AND VENUE

3. This action is brought by the United States under the False Claims Act, 31 U.S.C. §§ 3729 – 3733 and at common law.

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345.

5. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendant resides in this district.

## PARTIES

6. Plaintiff is the United States of America.  At all times material to this civil action, the Department of Health and Human Services (HHS) was an agency and instrumentality of the Plaintiff United States, and the Centers for Medicare and Medicaid Services (CMS) was the component agency of HHS which administers and supervises the Medicare program, 42 U.S.C. §§ 1395 et seq.  CMS contracted with a private insurance carrier to receive, adjudicate, process, and pay certain Medicare Part B claims submitted to it by Medicare beneficiaries or providers.

7. Defendant, Joseph P. Thomas, M.D., at all times relevant to this case, was a licensed practicing physician specializing in internal medicine.  Defendant also operated a group practice and an in-house laboratory that offered a variety of diagnostic tests.  Both his practice and in-house laboratory were physically located at 1445 Harrison Avenue NW, Suite 200,

2

Canton, Ohio. His employees included physicians, laboratory technicians, medical assistants, and office staff.

## MEDICARE PART B PROGRAM

8. In 1965, Congress enacted Title XVIII of the Social Security Act, commonly known as Medicare. 42 U.S.C. §§ 1395 et seq.

9. The United States, through HHS and its component agency, CMS, administers the Supplementary Medical Insurance Program for the Aged and Disabled as established in Part B, Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395j-1395w (Medicare Part B Program). HHS has delegated the administration of the Medicare Program to CMS.

10. The Medicare Part B Program is a federally subsidized health insurance system for persons aged sixty-five and older, or who have certain qualifying disabilities or conditions. Eligible persons may enroll in the Medicare Part B Program to obtain benefits in return for payments of monthly premiums as established by HHS. The benefits covered by the Medicare Part B Program include medical treatment and services by physicians under 42 U.S.C. § 1395k(a)(2)(B).

11. At all relevant times herein, HHS, through CMS, administered the Medicare Part B Program in the state of Ohio through a private insurance contractor. Initially, that private insurance contractor was Palmetto Government Benefits

Administrators (Palmetto GBA), and subsequently the Program was administered through CGS Administrators, LLC (CGS), a Medicare Administrative Contractor (MAC). These contractors made payments on those claims which appeared to be eligible for reimbursement under the Medicare Part B Program.

## THE MEDICARE PROVIDER AGREEMENT

12. At all relevant times herein, Ohio providers claimed Medicare Part B reimbursement from the contractor pursuant to written provider agreements.

13. Defendant signed, or caused to be executed, provider agreements with the Medicare Program that permitted the Defendant to submit claims to and accept payment from the Medicare contractor.

14. Providers, including the Defendant, agree to be familiar with, and abide by, the Medicare laws, regulations, and policies. These agreements are conditions of participation in the Program and conditions of receiving payment from the Program. Providers are told that the Medicare laws, regulations, and program instructions are available through the Medicare contractor. Medicare contractors communicate reimbursement policies to providers, including the Defendant, through the Medicare Manual, newsletters, and other communications.

15. The Medicare contractor receives, processes, and pays or rejects claims according to Medicare rules, regulations, and procedures.

16. Medicare covers, and participating providers agree, to bill only for services that are covered by Medicare that the provider actually renders that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation.  42 U.S.C. § 1395y(a)(1)(A).  Such documentation includes test results and a doctor's orders, progress notes, and operative reports.

17. A provider who treats a Medicare patient is required to submit a Medicare Health Insurance Claim Form, known as the HCFA Form 1500, to the Medicare contractor, which, on behalf of CMS, pays a portion of the claim.

18. The HCFA Form 1500 requires the provider to certify that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision . . . ."

19. The HCFA Form 1500 contains the following certification: "I certify that the statements on the reverse apply to this bill and are made a part thereof."  The HCFA Form 1500 warns providers that "[a]ny person who knowingly files a

5

statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

20.  Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

21.  Generally, once a provider submits CMS Form 1500 to the Medicare contractor, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

22.  At all times relevant herein, Defendant submitted Medicare Part B claims for medical services and tests, including diagnostic testing to Palmetto GBA or CGS.  The Medicare contractor then processed those claims on behalf of Medicare.

23.  CMS regulations require providers to use the American Medical Association's Current Procedural Terminology ("CPT") numeric codes to describe, in their claims to Medicare, the procedures or services they rendered. 45 C.F.R. §§ 162.1002 (a)(5) and 162.1002(b)(1); Medicare Claims Processing Manual,

6

Pub. 100-04, Chapter 23, Fee Schedule Administration and Coding Requirements, Section 20.

24. CMS issues National Coverage Determinations ("NCDs") on what procedures and services will be eligible for payment under the Medicare statute.

25. Medicare contractors issue local decisions on what procedures and services will be eligible for payment under the Medicare statute.

26. Prior to December 7, 2003, such local decisions were called Local Medical Review Policies ("LMRPs"). After December 7, 2003, such statements were called Local Coverage Determinations ("LCDs").

## FACTS

27. Defendant was a licensed practicing physician specializing in internal medicine and operated his medical practice under the name Joseph P. Thomas, M.D.

28. Defendant also operated an in-house laboratory, which was physically located within his practice that offered a variety of diagnostic tests.

29. Defendant also operated a group practice that employed other physicians.

30. Defendant surrendered his medical license on or about October 5, 2014 and has not been licensed to practice since that date.

7

31. From on or about January 1, 2006, through on or about March 25, 2016, Defendant submitted approximately 141,177 claims and received approximately $1,492,391.43 from Medicare Part B for the following medical and laboratory tests:

| CPT Code | Description of Tests and Services |
|---|---|
| 80061 | blood test, lipids (Lipid panel) |
| 81000 | manual urinalysis test (UA) |
| 82043 | urine microalbumin level |
| 82272 | fecal occult blood (FOB) |
| 82570 | creatinine level |
| 82947 | blood glucose level |
| 83036 | hemoglobin A1C level (HbA1c) |
| 83880 | brain natriuretic peptide level (BNP) |
| 85025 | automated complete blood cell count (CBC) |
| 85610 | blood test, clotting time |
| 85651 | red blood cell sedimentation rate (ESR) |
| 93000 | routine EKG |
| 93306 | ultrasound of heart |
| 93325 | doppler ultrasound of heart |
| 93880 | ultrasound scanning of blood flow of both sides of head/neck |

32. The United States alleges that a majority of those claims for medical and laboratory tests were either medically unnecessary and/or never performed and thus were not properly payable by Medicare.

33. By way of example, Defendant submitted to and was paid by the Medicare contractor, the following claims for medical and laboratory tests that were not medically necessary and thus not reimbursable by Medicare Part B:

8

| Claim Number | Patient Name | Date of Service | CPT Code Billed | Amount Paid | Date Paid |
|---|---|---|---|---|---|
| 360208284113530 | LM | 10/8/08 | 85025 | $10.86 | 10/15/08 |
|  |  |  | 83036 | $13.56 |  |
|  |  |  | 80061 | $12.92 |  |
|  |  |  | 82043 | $ 8.09 |  |
|  |  |  | 82570 | $ 7.23 |  |
|  |  |  | 85651 | $ 4.96 |  |
|  |  |  | 81000 | $ 4.43 |  |
| 360208284113540 |  |  | 82947 | $ 4.85 |  |
| 231012173304020 | BL | 6/8/12 | 81000 | $ 4.48 | 6/26/12 |
|  |  |  | 82947 | $ 5.56 |  |
|  |  |  | 83036 | $13.75 |  |
|  |  |  | 85025 | $11.02 |  |
|  |  |  | 85651 | $ 5.02 |  |
| 231012279308940 | RH | 9/1/12 | 82043 | $ 8.19 | 10/10/12 |
|  |  |  | 85651 | $ 5.02 |  |
|  |  |  | 82570 | $ 7.33 |  |
|  |  |  | 81000 | $ 4.48 |  |
|  |  |  | 85025 | $11.02 |  |

34.  By way of further example, Defendant submitted to the Medicare contractor claims for CPT Code 85025 (CBC) for Medicare beneficiary RH for the following dates of service:  7/19/12; 9/1/12; 9/14/12; 10/18/12; 11/23/12; 1/21/13; 2/21/13; 4/22/13; 8/27/13; 9/17/13; 10/18/13; 12/12/13; 1/15/14; 4/8/14; 5/9/14.  Defendant's routine testing of Medicare beneficiary RH for complete blood count was medically unnecessary and not properly payable by Medicare.  NCD for Blood Counts (190.15).

35.  By way of further example, Defendant submitted to the Medicare contractor claims for CPT Code 81000 (UA) for Medicare beneficiary BL for the following dates of service: 5/27/10; 6/28/10; 7/26/10; 9/21/10; 10/19/10; 11/16/10; 12/14/10;

9

1/13/11; 2/11/11; 3/11/11; 4/7/11; 6/6/11; 9/9/11; 11/4/11; 12/30/11; 3/2/12; 3/30/12; 4/4/12; 6/8/12; 7/6/12; 9/1/12; 10/5/12; 11/2/12; 1/4/13; 5/3/13; 5/31/13; 7/5/13; 8/30/13; 9/27/13; 12/6/13; 1/2/14; 1/31/14; 3/28/14; 6/20/14; 8/12/14. Defendant's routine testing of Medicare beneficiary BL for manual urinalysis testing was medically unnecessary and not properly payable by Medicare.

36. By way of further example, Defendant submitted to the Medicare contractor claims for CPT Code 85651 (ESR) for Medicare beneficiary PF for the following dates of service: 1/17/06; 2/11/06; 2/27/06; 3/10/06; 6/7/06; 8/4/06; 9/5/06; 10/3/06; 10/31/06; 12/30/06; 1/17/07; 1/29/07; 2/28/07; 3/23/07; 4/9/07; 4/19/07; 6/8/07; 7/3/07;8/8/07; 10/3/07; 10/17/07; 11/12/07; 12/18/07; 2/19/08; 3/24/08; 4/14/08; 6/16/08/; 7/22/08; 10/3/08; 10/31/08; 12/3/08; 12/31/08; 1/9/13; 2/12/13; 3/12/13; 4/16/13; 6/13/13; 7/8/13; 8/13/13; 10/14/13; 12/13/13; 1/15/14; 2/11/14; 3/13/14; 4/15/14; 4/22/14; 5/20/14; 6/17/14; 7/28/14. Defendant's routine testing for Medicare beneficiary PF for red blood cell sedimentation rate was medically unnecessary and not properly payable by Medicare.

37. By way of further example, Defendant submitted to the Medicare contractor claims for CPT Code 82947 (blood glucose level) for Medicare beneficiary AP for the following dates of service: 2/1/06; 4/15/06; 7/14/06; 9/1/06; 8/11/07; 11/7/07;

10

9/17/08; 10/15/08; 11/3/08; 11/21/08; 12/19/08; 1/29/09; 3/19/09; 11/18/09; 11/28/09; 6/26/10; 2/9/11; 6/11/11; 9/19/11; 12/17/11; 3/26/12; 5/5/12; 5/23/12; 6/27/12; 7/25/12; 8/22/12; 10/20/12; 12/1/12; 1/19/13; 2/6/13; 8/10/13; 10/5/13; 12/20/13; 3/22/14; 4/21/14; 9/3/14. Defendant's routine testing of Medicare beneficiary AP for blood glucose was medically unnecessary and not properly payable by Medicare. NCD for Blood Glucose Testing (190.20).

38. Patient records reveal laboratory testing was performed on a repeated basis at frequent intervals despite repeated normal values, lack of medical necessity, patient complaints and little reference to the results in the office notes.

39. This repeated testing suggests that Defendant was attempting to maximize his practice's revenue from inappropriate and gross overutilization of diagnostic services provided in-office.

40. Data analysis conducted by the Medicare and Medicaid contractors indicate that Defendant was billing a high volume of labs and diagnostic exams compared to his peers.

41. Multiple former employees of Defendant stated to law enforcement agents that Defendant reviewed patient charts the day before their appointments and ordered tests for patients before they were ever examined.

11

42. Multiple former employees of Defendant stated to law enforcement agents that Defendant would routinely order tests for patients being treated by physicians in his group practice even though those physicians never ordered or authorized those tests.

43. A former employee of Defendant stated to law enforcement agents that some patients complained that Defendant forced them to have rectal exams as well as breast exams every time they had an appointment.

44. Multiple former employees of Defendant stated to law enforcement agents that Defendant would agree to write prescriptions for narcotics in return for the patients agreeing to undergo needless medical and laboratory testing and if they refused to undergo the tests, the Defendant would not write the prescription.

45. Multiple former employees of Defendant stated to law enforcement agents that many of his patients were narcotic drug abusers and that Defendant would ignore the Ohio Automated RX Reporting System (OARRS) reports and the results of urine drug screens when prescribing narcotics to patients.

46. Multiple former employees of Defendant stated to law enforcement agents that Defendant routinely performed excessive and unnecessary tests on his patients including x-rays, EKGs,

hemoglobin A1C level, red blood cell sedimentation rate, urine microalbumin level, complete blood cell count, fecal occult blood, blood glucose level and manual urinalysis.

47.  Multiple former employees of Defendant stated to law enforcement agents that Defendant created false lab records in patients' charts including marking tests and x-rays as being completed when in fact they were never performed, falsifying lab results, upcoding evaluation and management codes and altering diagnosis codes.

48.  By way of further example, Defendant presented a claim and received payment from the Medicare contractor for hemoglobin A1C level blood tests with a date of service of 5/25/12 for patient SH. Defendant had preordered a series of tests on the office's patient daily schedule to be performed for patient NC that did not include a test for hemoglobin A1C level blood.  On the office's white routing slip, Defendant highlighted hemoglobin A1C level blood test to be billed, but on the lab log book, this test is not circled to be performed.  Per statements by former employees and the medical records, the test was never performed and Defendant handwrote a fictitious test result in the office's blue in-house laboratory data sheet.

49.  By way of further example, Defendant presented claims and received payment from the Medicare contractor for blood sedimentation rate ("ESR") and hemoglobin A1C ("HbA1c") level

13

blood tests with a date of service of 3/16/12 for patient MB. Defendant had preordered a series of tests on the patient daily schedule to be performed for patient MB that did not include a test for HbA1c or ESR. On the white routing slip, Defendant highlighted HbA1c and ESR to be billed but on the lab log book, HbA1c and ESR are not circled to be performed.  Per statements by former employees and the medical records, neither test was performed and Defendant handwrote fictitious test results in the blue in-house laboratory data sheet.

    50.  Defendant knew or should have known that the aforementioned medical and laboratory tests he performed during the relevant time period were not medically necessary and thus were excluded from coverage under Medicare Part B.

COUNT I
Violation of the False Claims Act
31 U.S.C. § 3729(a)(1)(2006) and 31 U.S.C. § 3729(a)(1)(A)(2009)

    51.  Plaintiff incorporates by reference all preceding paragraphs 1 through 50 of this Complaint as if fully rewritten herein.

    52.  By the acts described above, Defendant knowingly presented, or caused to be presented to an officer or employee of the United States Government, false or fraudulent claims through the Medicare Part B Program for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(2006) and 31 U.S.C. § 3729(a)(1)(A) (2009).

53. The United States paid the false or fraudulent claims because of Defendant's acts, and incurred damages as a result.

54. Pursuant to 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States for three times the amount of all damages sustained by the United States because of Defendant's conduct.

55. Pursuant to 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act committed by Defendant.

COUNT II
Violation of the False Claims Act
<u>31 U.S.C. § 3729(a)(1)(B)</u>

56. Plaintiff incorporates by reference all preceding paragraphs 1 through 55 of this Complaint as if fully rewritten herein.

57. Defendant violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, as defined in 31 U.S.C. § 3729(b)(2).

58. The United States paid the false or fraudulent claims because of Defendant's acts, and incurred damages as a result.

59. Pursuant to 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States for three times the amount of all

damages sustained by the United States because of Defendant's conduct.

60.  Pursuant to 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act committed by Defendant.

## COUNT III
### UNJUST ENRICHMENT

61.  Plaintiff incorporates by reference preceding paragraphs 1 through 60 of this Complaint as if fully rewritten herein.

62.  This is a claim for the recovery of monies by which Defendant has been unjustly enriched.

63.  By directly or indirectly obtaining government funds to which he was not entitled, Defendant was unjustly enriched, and is liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT IV
### PAYMENT BY MISTAKE

64.  Plaintiff incorporates by reference preceding paragraphs 1 through 63 of this Complaint as if fully rewritten herein.

65.  The United States has paid money to Defendant for services provided under the Medicare Program.

66. The United States paid Defendant that money based upon a mistaken belief that the services provided were covered under the Medicare Program. The United States would not have paid for such claims had it known the true facts.

67. The United States would not have paid Defendant if the United States had not been mistaken, resulting in damages to the United States in an amount to be determined at trial.

WHEREFORE, Plaintiff demands that judgment be entered in its favor and against Defendant as follows:

   a.   On COUNT ONE in the amount of triple Plaintiff's damages plus penalties as allowed by law;

   b.   On COUNT TWO in the amount of triple Plaintiff's damages plus penalties as allowed by law;

   c.   On COUNT THREE in the amount of Plaintiff's damages plus prejudgment interest;

   d.   On COUNT FOUR in the amount of Plaintiff's damages plus prejudgment interest;

   e.   On ALL COUNTS for the costs of this action, and such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

DAVID A. SIERLEJA
Acting United States Attorney

By: s/Steven J. Paffilas
Steven J. Paffilas (OH: 0037376)
Brendan F. Barker (IL: 6299039)
Assistant U.S. Attorneys
United States Courthouse
801 West Superior Avenue, #400
Cleveland, OH 44113
Phone: (216) 622-3698/3795
Fax: (216) 522-4982
E-Mail: Steven.Paffilas@usdoj.gov
Brendan.Barker@usdoj.gov

ATTORNEYS FOR THE
UNITED STATES OF AMERICA